United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 9, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

—————————————

No. 04-40474

—————————————

GREGORY MOORE,

Plaintiff-Appellee

versus

JANIE COCKRELL, Etc., ET AL,

Defendants

JANIE COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE
INSTITUTIONAL DIVISION; CHARLES D. LIGHTFOOT, Major of
Correctional Officers - Beto One Unit Classification; CORNELIUS
E. SMITH, Captain of Correctional Officers; SHELY S. BALDWIN,
Correctional Officer

Defendants-Appellants

--------------------
Appeal from the United States District Court
for the Eastern District of Texas
6:03-CV-82-LED
--------------------

Before KING, Chief Judge, BENAVIDES and STEWART, Circuit Judges.

PER CURIAM:[*]

This interlocutory appeal requires us to determine whether

the district court erred by ruling that Defendants-Appellants'

--------------------

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

1

motion for summary judgment was untimely.  Determining that it did so err and because of the peculiar circumstances under which the alternative merits determination was made, we vacate and remand for further proceedings consistent with this opinion.

BACKGROUND[1]

Plaintiff-Appellee Gregory Moore ("Moore"), an inmate of the Texas Department of Criminal Justice, Institutional Division ("TDCJ-ID"), filed this civil rights lawsuit under 42 U.S.C. § 1983 against various prison officials asserting that they were deliberately indifferent to threats of physical violence towards Moore made by fellow prisoners.  The threats stemmed from the discovery by his fellow inmates that Moore was serving a sentence for child molestation.

Apparently, in May 2002, an individual using the name Rudolph Hess posted information on an internet bulletin board urging reprisals against sex offenders.[2]  It appears that inmates

---

[1] Because the district court opinion does not include a summary of the facts, the factual background presented here represents our best understanding of the facts of the case based on the parties' submissions to this Court.  We do not in any way intend to resolve any disputed factual matters that may exist.  As we note below, because Defendants-Appellants immediately appealed the district court's denial of their motion for summary judgment on the basis of qualified immunity, Plaintiff-Appellee has never had a chance to respond to their motion for summary judgment.  When Plaintiff-Appellee does have his chance to respond, he may present evidence supporting facts that are different than the facts as we present them here.

[2] Moore alleges that Hess was a pseudonym for a prison guard, but he does not specifically allege that one of the named

2

in the Beto Unit, where Moore was housed, became aware of this posting. Some inmates also discovered which of their fellow inmates had been convicted of sex offenses. Moore alleges that Defendant-Appellant Officer Shely Baldwin told prison gang members that Moore had been convicted of child molestation.

Soon after the Hess posting, an Attorney named Bill Habern wrote a letter to Janie Cockrell, Director of the TDCJ-ID, reminding her that the TDCJ has a duty to protect its prisoners. In response, Larry Todd, spokesperson for the TDCJ, told a reporter for the Dallas Morning News that if a sex offender inmate is harassed or threatened, the TDCJ would transfer the inmate to another unit or place the inmate in protective custody.

On October 2, 2002, several gang members physically assaulted inmates on the Beto Unit who had been labeled as informants, including at least one sex offender. As a result of these attacks, the Beto Unit was placed in lockdown.

Between the October 2, 2002 lockdown and January 8, 2003, when Moore was ultimately involved in a violent altercation with an inmate named Clifton Holiday, Moore made four life endangerment claims. In each claim, he informed prison officials that gang members housed within the Beto Unit were threatening with physical violence inmates who were imprisoned for sexual offenses, including Moore. Moore specifically named Holiday as

---

Defendants-Appellants posted the message.

3

one of the gang members making such threats in two of his life endangerment claims.

As described by Defendants-Appellants, the TDCJ-ID procedure for investigating and evaluating a life endangerment claim is as follows. The claim is logged into the unit classification office in the offender protection log and it is assigned to a ranking officer to conduct an investigation. After the investigation is completed, it is returned to the unit classification office, which sets the claim for a hearing before the next available Unit Classification Committee ("UCC").

A UCC is made up of three voting members: a chairperson, a unit security representative, and a person from the unit's treatment team. The UCC reviews and makes recommendations regarding an inmate's custodial classification while at the unit. No single individual at the unit, including the senior warden, has the authority to change the custodial classification of an inmate. The UCC can change an inmate's classification by majority vote. The UCC may recommend a housing change, placement in safekeeping, placement in protective custody, or a unit transfer. However, the State Classification Committee ("SCC") in Huntsville has to approve the UCC's recommendations.[3] It also

---

[3] While Moore acknowledges the UCC and SCC and their role in unit transfers, he also appears to contend that a UCC panel has the ability to override/disregard the SCC and/or that an individual member of a UCC panel has the ability to dictate the conclusions of the panel.

4

appears that an individual prison officer at least sometimes has the ability to place an inmate who is in danger in transient housing, pending a formal life endangerment investigation.

Moore's first life endangerment claim, filed on October 12, 2002, alleged that inmate Richard Tidwell was the instigator of a plan to rid the Beto Unit of sex offenders. Moore said that he overheard inmate Benton Morgan mention Moore's name to Holiday, stating that Moore was next on the list to leave the unit. Defendant-Appellant Captain Cornelius Smith investigated Moore's October 12, 2002 claim, and on October 16, 2002, Moore came before the Beto Unit Classification Committee for a life endangerment review. The members of that UCC were Defendant-Appellant Major Charles Lightfoot and two non-defendants.

The UCC voted unanimously to place Moore in transient status when the lockdown was lifted, and recommended a unit transfer. However, the unit transfer was denied by the SCC on October 24, 2002 because of a lack of corroborating evidence. A different UCC, consisting of Major Lightfoot and two other non-defendants, informed Moore on October 28, 2002 that the SCC had denied his request for a unit transfer. On that same date, Moore was assigned to N-Wing, which is the Beto Unit's transient status housing. Moore remained there from October 28, 2002 to November 5, 2002.

When prison officials attempted to move Moore from transient housing to his new housing assignment, he refused to move. As a

result, he was placed in Pre-Hearing Detention on November 5, 2002.

On November 6, 2002, Moore brought his second life endangerment claim. In that claim, Moore alleged new developments since his October 16, 2002 UCC hearing, including that inmate Morgan had come to his cell and threatened him. Moore again requested a unit transfer because he believed his life was in danger. Defendant-Appellant Captain Cornelius Smith investigated Moore's second claim and a UCC was convened on November 8, 2002. The UCC was composed of three non-defendants. The UCC voted unanimously to table Moore's life endangerment review until a prison official, Lt. J.S. Clark, could provide additional information.

On November 8, 2002, prison officials moved Moore from Pre-Hearing Detention to overflow transient status housing in X-Wing. He remained there until December 23, 2002.

On November 13, 2002, the UCC reconvened the November 8, 2002 hearing because it had received the additional information from Lt. Clark. This UCC was also composed of three non-defendants. They voted unanimously to deny Moore's request for a transfer because of a lack of corroborating evidence.

Undeterred, Moore then brought a grievance, which prison officials treated as another life endangerment claim. It appears that Moore never had a UCC hearing for this claim. Instead, Beto Unit Classification Chief Sun Berg included Moore in a

recommendation that she sent to the SCC after a November 18, 2002 UCC hearing for three other convicted sex offenders. In this recommendation to the SCC, Berg recommended transfers for Moore and the other three sex offenders.

However, the SCC did not follow Berg's recommendation. Instead, it ordered transfers for five inmates who were threatening the convicted sex offenders rather than transferring the sex offenders themselves to safekeeping. The five inmates transferred were Richard Tidwell, Dustin Dixon, Robert Leifester, Benton Morgan, and John Wheeler.

After these five inmates had been transferred, an SCC member, V. Sineguare, sent a memo to Beto Unit Classification Chief Berg on December 17, 2002 directing her to transfer Moore and the three other sex offender inmates from transient housing back to General Population.

In the meantime, on December 12, 2002, Moore's attorney, John Bennett, notified TDCJ-ID officials including Director Cockrell and the Beto Unit Warden that Moore was still in danger from inmate gang members even though he was in transient housing. Bennett requested, to no avail, that the officials do something more to protect Moore, such as transferring him to a safekeeping unit.

Additionally, Moore alleges that on December 17, 2002, a Beto Unit classification officer sent Director Cockrell a memo outlining the history of threats to Moore's safety between

7

October 12, 2002, and December 17, 2002. The memo specifically identified Holiday as a threat. Moore further alleges that an individual in Director Cockrell's office requested a second copy of this memo on December 18, 2002.

On December 23, 2002, a UCC composed of Defendant Major Lightfoot and two non-defendants informed Moore of the SCC's decision to release him back to General Population.

From December 23, 2002 to January 8, 2003, Moore was housed in M Wing, in the general population. Moore alleges that once he returned to the general population he immediately started to receive death threats and that he relayed them to prison officials. Moore further alleges that Holiday directly threatened him on December 25, 2002, and that he again reported the threat.

On January 5, 2003, Moore filed his fourth life endangerment claim. In this claim, Moore alleged that Holiday and another inmate, Frank Williams, had threatened him and that his life was in danger. Moore requested a transfer out of the Beto Unit because the other inmates had become aware of his conviction for a sex offense. Prison official Lt. Williams completed the investigation of Moore's fourth claim on January 8, 2003. On that same day, Moore signed a waiver of his claim and of his request for a unit transfer. Moore now asserts that a prison official named Timmons coerced him into rescinding his claim.

Later that day, at approximately 6 p.m., Holiday and Moore

8

had a violent encounter in the north-side Dining Hall. Moore alleges that he was attacked and that he suffered a "brutal stabbing." Prison officials describe the encounter as a fistfight and his injuries as minor. Holiday contended that Moore struck him first, but he also admitted that he did not like Moore because of his status as a sex offender.

After the encounter with Holiday, Moore was again moved to transient status where he remained until February 13, 2003. Because of the fight, prison officials initiated another life endangerment investigation, which was completed on January 10, 2003. On January 13, 2003, a UCC composed of three non-defendants voted unanimously to recommend a unit transfer and they asked the SCC to review Moore for possible placement in safekeeping status.

On February 13, 2003, Moore was transferred from the Beto Unit to the Michael Unit.

PROCEEDINGS

Moore brought this action alleging that the officials named were all deliberately indifferent to the threats of violence that he faced. Pursuant to an amended scheduling order, the trial was scheduled to commence on April 13, 2004. The prison officials involved in this appeal filed a motion to dismiss, which was

9

denied in relevant part on March 5, 2004.[4]  The prison officials then filed a motion for summary judgment on April 5, 2004.  The district court, in an order dated April 8, 2004, determined that this motion was untimely.  The district court also found that even assuming *arguendo* that the motion had been timely filed, the prison officials had not overcome their summary judgment burden given that genuine issues of material fact existed as to preclude the granting of the motion.

The district court ruled on the summary judgment motion within three days of its filing and long before the expiration of the time allotted under the Local Rules and the Federal Rules of Civil Procedure for Moore to file a response.[5]

The very next day, April 9, 2004, the prison officials filed this interlocutory appeal.  By doing so, the prison officials invoked the jurisdiction of this Court before Moore's time to respond to the summary judgment motion had expired.  As a result, Moore did not file a response to Defendant's motion for summary judgment before the district court lost jurisdiction by virtue of Appellants' notice of appeal.

JURISDICTION

---

[4] On March 19, 2004, the district court ruled upon the last of the motions to dismiss, which related to defendants who are not part of this appeal.

[5] The Local and Federal Rules provided Moore with at least 15 days to respond after he had been served with Defendants' motion for summary judgment.  *See* n.8 and n.9, *infra*.

This Court has jurisdiction to review the denial of summary judgments seeking qualified immunity in an interlocutory appeal under the "collateral order" doctrine, as explained by the Supreme Court in *Mitchell v. Forsyth*. 472 U.S. 511, 530 (1985). Because qualified immunity implicates the right not to stand trial, denial of a qualified immunity claim is final in that the right to avoid trial cannot be vindicated by later appeal. *Id*. at 526-27. Our jurisdiction in such cases is not unlimited, however. As the qualified immunity analysis is "significantly different from the questions underlying [a] claim on the merits," and questions of "evidence sufficiency" are not appealable, *Johnson v. Jones*, 515 U.S. 304, 314 (1995), we may only review a denial of qualified immunity "to the extent that it turns on an issue of law." *Mitchell*, 472 U.S. at 530.[6]

DISCUSSION

I.

We must first determine whether the district court erred by

---

[6] Moore's contention that this Court does not have jurisdiction to hear this appeal is without merit. He contends that this case is like *Edwards v. Cass County, Texas*, in which we held that we normally do not have jurisdiction to hear an interlocutory appeal when the district court declines to consider a motion for summary judgment asserting qualified immunity because it is untimely. 919 F.2d 273, 275 (5th Cir. 1990). In the instant case, however, the district court ruled both that Defendants-Appellants' motion for summary judgment was untimely *and* held in the alternative that it was without merit. Because the district court in the instant case has ruled on the merits of Defendants-Appellants' assertion of qualified immunity, *Edwards* does not apply.

11

holding that the prison officials failed to timely submit their motion for summary judgment. Because district courts are vested with broad discretion to determine their own dockets as warranted, the abuse of discretion standard governs. *Edwards v. Cass County*, *Texas*, 919 F.2d 273, 275 (5th Cir. 1990).

The district court cited *Edwards* for the proposition that "the refusal to allow filing of a substantive motion on the eve of trial is normally within the district court's discretion." It then held that the prison officials' motion was untimely because "the moving Defendants waited until one week before the scheduled trial to file a lengthy motion for summary judgment, together with over 150 pages of exhibits."

However, the facts of the instant case are distinguishable from *Edwards*. In *Edwards*, the district court had issued a scheduling order setting a deadline of March 5, 1990 for the filing of all pre-trial motions, including motions for summary judgment. *Id*. at 274. With a jury trial set to begin on June 5, 1990, the defendants filed a motion for leave to file an out-of-time motion for summary judgment asserting qualified immunity on June 4, 1990. *Id*. The district court denied the motion, and we affirmed, stating that

> a court's refusal to allow the filing of a substantive motion on the eve of trial *three months after the expiration of a deadline (especially where no extension has been sought)* should normally be deemed well within the court's discretion. In other words, a district court seldom would be obliged to interrupt the orderly

12

> proceedings of its docket to rule on so critical an issue where the same easily could have been presented at an earlier date.

*Id.* at 275-76 (emphasis added).

In contrast to *Edwards*, the district court never issued a scheduling order in the instant case. Without such an order, the prison officials were not sufficiently put on notice that a motion filed on April 5, 2004 would be considered untimely. The motion was filed within three weeks of the district court's ruling on the last motion to dismiss, and the district court had previously moved the trial date back to accommodate pre-trial proceedings.[7]

These facts distinguish the instant case from *Edwards*. Unlike the defendants in *Edwards*, Defendants-Appellants did not file their motion one day before trial and three months after the deadline for filing pre-trial motions set in a scheduling order.

Moore also contends that the district court's ruling that the prison officials' motion was untimely can be supported by the Eastern District of Texas's Local Rules of Civil Procedure. The Local Rules provide that a party opposing a dispositive motion is

---

[7] Between March 2, 2004 and March 9, 2004, with the trial then scheduled to commence on March 16, 2004, the defendants then in the case filed various motions to dismiss. The defendants contemporaneously filed a motion to stay pretrial hearing and trial setting, which the court granted, resetting the trial date for April 13, 2004. Defendants-Appellants filed a similar motion on April 5, 2004, along with their motion for summary judgment, to no avail.

provided a period of twelve days from the date the motion was served in which to serve and file a response, with an additional three days added pursuant to Rule 6(e) of the Federal Rules.[8] *See* United States District Court for the Eastern District of Texas, Local Rule CV-7(e), *available at www.txed.uscourts.gov/* (as of July 31, 2005).[9]  The prison officials filed their motion on April 5, 2004, and the trial was scheduled to commence on April 13, 2004, so Moore's response to the prison officials' motion would have been due well after the trial had begun.

Nevertheless, neither the Local Rules nor any order from the district court provided the prison officials with a fixed deadline for filing their motion for summary judgment.  Local Rule CV-7(e) sets forth the amount of time that a party opposing

---

[8] Fed. R. Civ. P. 6(e) provides:

Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party under Rule 5(b)(2)(B), (C), or (D), 3 days shall be added to the prescribed period.

[9] Local Rule CV-7(e) provides:

A party opposing a motion has 12 days from the date the motion was served in which to serve and file a response and any supporting documents, after which the court will consider the submitted motion for decision. Except for motions served under Fed.R.Civ.P. 5(b)(2)(A), three days shall be added to the prescribed time period pursuant to Fed.R.Civ.P. 6(e). Any party may separately move for an order of this court lengthening or shortening the period within which a response may be filed.

a motion has in which to respond, but it does not definitively set a deadline for filing a motion for summary judgment asserting qualified immunity.[10]  To the contrary, the rule itself contains flexibility in the form of a clause allowing for the response time period to be lengthened or shortened.  As a result, it does not provide parties with a definitive deadline for filing motions.  Without a definitive deadline, the prison officials were not given sufficient warning that their motion for summary judgment would be considered untimely if filed on April 5, 2004.

Because the district court did not give sufficient notice to the parties regarding the deadline for filing motions, in the form of a scheduling order, a local rule, or otherwise, we find that under the unique circumstances presented here, the district court abused its discretion by ruling that the prison officials' motion for summary judgment was untimely.

## II.

Ordinarily we would next consider whether the district court erred in its alternative holding that the prison officials failed to show that they were entitled to summary judgment on the basis

---

[10] In contrast, the Western District of Texas's Local Rules of Civil Procedure provide a fixed date by which defendants must assert qualified immunity.  *See* United States District Court for the Western District of Texas, Local Rule CV-12, *available at http://www.txwd.uscourts.gov/rules/online/default.asp* (as of July 31, 2005) (requiring defendants to assert qualified immunity within 30 calendar days of their initial pleading or, if asserted in response to allegations made in an amended complaint, within 20 days of the date the amended complaint was filed).

15

of qualified immunity.  Indeed, Appellants insist that they are entitled to summary judgment on their qualified immunity claims. The panel is loathe, however, to make a final determination on the qualified immunity claims at this time.  This is because, as explained previously, Moore did not have the opportunity to respond to Defendants-Appellants' motion for summary judgment and was deprived the time to respond as provided in the rules.  This case thus presents an unusual procedural posture.  Given this, we will refrain from squarely addressing the merits of the prison officials' assertions of qualified immunity at this juncture. However, some brief additional commentary is necessary.  On remand, the district court should heed particular attention to our en banc decision in *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004), of which all three members of this panel belonged to the majority.  In *Kinney*, we commented that "before engaging in the inquiry into whether the [prison] official unreasonably violated clearly established law, we should first determine whether the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of federal law in the first place."  367 F.3d at 550.  While the referenced language actually was stated in the context of addressing our standard of review, on remand, the district court must be mindful of the specific allegations that have been brought against each prison official, and must ask whether Moore - in light of our

precedent - has alleged conduct that expressly runs afoul of the Constitution.  If he has not, then the qualified immunity inquiry need go no further.  The record as presented is not pellucid as to whether Moore has alleged conduct that is considered constitutionally infirm; however, we need go no further, as we believe the district court should be afforded the opportunity to make this determination in the first instance after Moore has an opportunity to respond to the motion for summary judgment with whatever summary judgment arguments and summary judgment evidence he might properly present to the District Court.  Accordingly, the panel is of the view that this case should be remanded and considered under proper procedures.

VACATED AND REMANDED.